IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| CHARLES L. BURGETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20-cv-0036-DGK-SSA |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT SUMMARY JUDGMENT

This lawsuit arises from *pro se* Plaintiff Charles L. Burgett's employment with Defendant Social Security Administration. Plaintiff alleges the agency discriminated and harassed him because of his race and sex, and also retaliated against him for participating in protected activity.

Now before the Court is Defendant's Motion for Summary Judgment. ECF No. 49. Because Defendant has demonstrated it is entitled to summary judgment on all of Plaintiff's claims, the motion is GRANTED.

**Standard**

A movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court makes this determination by viewing the facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986). To survive

summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).

## Material Undisputed Facts

The material undisputed facts are as follows.[1]

**Plaintiff's hiring as a probationary employee**

Defendant Social Security Administration ("SSA") hired Plaintiff effective May 1, 2016, as a Customer Service Representative at its Kansas City, Missouri, Mid America Payment Service Center. Plaintiff's appointment was subject to completion of a one-year initial probationary period that would have concluded on May 1, 2017. The position was a mid-level developmental position which requires seeking advice from higher graded analysts.

The SSA provides structured training and developmental activities so that Customer Service Representatives employed on probationary status can gain experience and technical competence in the methods, procedures, principles, and techniques of the position. SSA supervisors define the objectives, priorities, and deadlines for projects or assignments and SSA supervisors evaluate reports and other completed work for technical soundness, appropriateness of conclusions or recommendations, consistency, and relevance.

The SSA's personnel policy states that during the probationary period, SSA supervisors continually evaluate the work performance and conduct of a probationary employee. If an employee's work performance or conduct fails to demonstrate fitness or qualifications for continued

---

[1] The Court has limited these facts to those that are undisputed and material to the pending summary judgment motion. Excluded are legal conclusions, argument presented as fact, and proposed facts not properly supported by admissible evidence. The Court has also included inferences from undisputed material facts and facts not controverted properly. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).

Federal employment, he or she is to be terminated without delay. If a decision is made to terminate a probationary employee, an SSA supervisor must provide the rationale supporting the decision, e.g., poor work performance, lack of aptitude or cooperativeness, undesirable suitability characteristics evidenced by his or her activities.

Plaintiff started at the SSA on May 1, 2016, and was in training during the entire period of his employment. The SSA terminated Plaintiff on November 30, 2016, while five months remained in his probationary period. During this time, Plaintiff was assigned to a training class comprised of sixteen probationary employees—five African-American males[2] (including Plaintiff), five African-American females, three White males, two White females, and one Asian female. The first line supervisor for his class was Monica Hawkins ("Hawkins"), an African-American female. Hawkins' supervisor was Training Module Manager Bryon Harris ("Harris"), an African-American male.

**Plaintiff's initial performance discussion**

On August 22, 2016, Hawkins conducted an initial performance discussion with Plaintiff to discuss Plaintiff's progress. Hawkins told Plaintiff that, during the preceding period of his employment, he had a total of 45 hours of casework time. He processed a total of 10 cases with an overall accuracy of 70.00%. His production rate was 1.78 cases per day. Hawkins also told Plaintiff that he seemed to struggle with the basic CSR concepts and that his instructors indicated that he lost focus from time to time.

On August 27, 2016, a Senior Claims Processing Specialist reviewed Plaintiff's processing queue. The specialist then gave Plaintiff additional specific instructions that affirmed Hawkins'

---

[2] The Court notes Defendant's observation that during the administrative proceedings on Plaintiff's discrimination claims, Plaintiff made it clear that he considered the use of the term "African-American Male" to be a demonstration of "arrogance and racism" and preferred to be called an "African Male." Because the relevant case law and underlying

3

prior explanation regarding how to process a case with multiple related cases pending. When Hawkins followed up on September 2, 2016, she discovered that he had failed to process any necessary action on the related cases pending for the same Social Security number as he had been instructed to do.

Plaintiff contends that on that same day, August 27, a reviewer he was working with, Marty Sanchez, determined that Plaintiff had been incorrectly assigned the related cases. He also contends Sanchez was guiding him on the correct method to process the other three related parts.

On September 9, 2016, Hawkins met with Plaintiff to discuss the case. Defendant contends Hawkins asked Plaintiff why he did not process the case as he had been directed on August 26, 2016. Plaintiff stated he did not know he was supposed to work the cases together. Hawkins concluded that Plaintiff had been on notice to process the assigned case, as well as the additional related cases, and his statement to the contrary was not credible.

Plaintiff disagrees with this description of their meeting. Plaintiff contends that when they discussed the case he informed Hawkins that he was actively working with Sanchez and the case was nearing completion. Hawkins seemed to be satisfied with this explanation, and Plaintiff thought the issue was resolved. Plaintiff contends the case was fully completed on September 12.

**Plaintiff's second performance discussion and reprimand**

On September 26, 2016, Hawkins again met with Plaintiff to discuss his training progress. She informed him of his work statistics since the last performance discussion, which were:

- For the period August 8 through August 25, 2016, Plaintiff had 40.25 hours of casework. During this period, Plaintiff processed 8 cases with 4 correct. Plaintiff's production was 1.59 cases per day with an accuracy

documents generally use the descriptor "African-American," the Court uses "African-American" for the sake of consistency, not to disparage Plaintiff.

rate of 50.00%.

- For the period of August 26 through September 2, 2016, Plaintiff had 27.25 hours of casework. He processed 5 cases with 3 correct. His production was 1.47 cases per day with an accuracy rate of 60.00%.

- Plaintiff's overall accuracy for both periods was 53.85% and his overall case per day production for the two periods was 1.54.

Plaintiff was told that feedback from his mentors and reviewers indicated that he tended to struggle with the basic concepts at that point in his training and had been challenged when it came to increasing his production.

On September 27, 2016, Hawkins issued Plaintiff an official written reprimand. The reprimand stemmed from Hawkins sending Plaintiff a directive to work on a matter in his processing queue on August 26, 2016, that involved a particular Social Security number. In her directive, Hawkins explained the processing queue is the highest level of priority, therefore cases within that queue should be processed timely. If any other related cases existed (i.e., cases involving the same Social Security number), Plaintiff was to work them as well in conjunction with his assigned case even if those related cases were in another employee's queue.

Hawkins believed that an official reprimand was the least severe penalty available to impress upon Plaintiff the seriousness of his action and to promote the efficiency of the service. Plaintiff was informed that any future acts of misconduct could lead to a more severe disciplinary action, up to and including, removal from federal service. A copy of a written reprimand is maintained in an employee's official personnel file and employee file for a year.

SSA management made the decision to issue a written reprimand to Plaintiff because Hawkins had already engaged in verbal discussions with Plaintiff, and he persisted in refusing to

5

work the assigned cases and the additional related cases.

Plaintiff understood that he was issued the reprimand because Hawkins claimed that he failed to follow her directive in processing a case, but he believed that only a verbal, undocumented warning should have been issued.

Plaintiff has identified a white male SSA employee, James Matthews ("Matthews"), who engaged in what Plaintiff believes is analogous misconduct but who was not issued a written reprimand. During a training session, Matthews told an SSA reviewer that something was "bullshit." Hawkins met with Matthews and told him that he was not to use that type of language in the classroom. Hawkins told Mathews that she was giving him a warning and the next time it happened he would get a letter of reprimand. Matthews apologized to both the reviewer and Hawkins. Matthews did not refuse to work all parts of an assigned case and did not repeat his behavior after the verbal warning.

**Plaintiff's third performance discussion**

On November 14, 2016, Harris met with Plaintiff to discuss his progress. Harris informed Plaintiff of his work statistics since the last performance discussion, which were:

- For the period of September 5 through September 19, 2016, Plaintiff had 69.25 hours of casework. During this period, Plaintiff processed 11 cases with 11 correct. Plaintiff's production was 1.27 cases per day with an accuracy rate of 100.00%.

- For the period of September 20 through October 14, 2016, Plaintiff had 83 hours of casework. During this period, Plaintiff processed 13 cases with 10 correct. Plaintiff's production was 1.25 cases per day with an accuracy rate of 76.92%.

- Plaintiff's overall accuracy for both periods was 87.50% and his overall daily average case production for the two periods was 1.26.

Harris told Plaintiff he was not performing at the level expected at that point in the training process.

6

Specifically, Plaintiff's level of production indicated he was not successfully managing his workload. Harris also told Plaintiff he was spending too much time on individual cases before seeking the assistance of a mentor, and that his low production also indicated that he struggled to conduct research independently. Harris told Plaintiff that he had serious concerns about his low production, that his job knowledge was at an unacceptable level, and that Plaintiff was not meeting the criteria within the elements and standards required to perform at a successful level in the CSR position. Harris concluded that if he did not see significant improvement in Plaintiff's production sufficient to demonstrate Plaintiff's ability to eventually perform at the journeyman level of an average of 15 cases per day at 90% accuracy by November 29, 2016, Harris would need to make a decision regarding Plaintiff's continued employment with SSA.

**Plaintiff's final performance review and termination**

On November 29, 2016, Harris reviewed Plaintiff's performance. For the period between November 14 and November 29, 2016, Plaintiff worked on 13 cases or 2.93 cases per day.

On November 30, 2016, Harris presented Plaintiff with a memorandum titled "Notice of Termination During Probationary Period." The memorandum explained that a probationary employee like Plaintiff could be terminated based on: (1) performance ("unacceptable progress towards qualifying for retention beyond the probationary period") or (2) conduct ("demonstrating an unsatisfactory attitude toward established agency rules and regulations"). With regard to Plaintiff's performance, it stated that Plaintiff's work showed an overall unfamiliarity with the SSA's commitment to high-quality customer service and stewardship of the agency's programs; Plaintiff did not demonstrate an understanding of the responsibility SSA's employees have to the public; and despite extensive assistance, Plaintiff's accuracy and level of production did not progress to an

7

Case 4:20-cv-00036-DGK    Document 56    Filed 09/26/22    Page 7 of 17

acceptable level. At Plaintiff's last performance interview, his daily average case production through October 14, 2016, was 1.26 cases per day with an accuracy of 87.50%. His daily average case production through November 28, 2016, was 2.15 cases per day with an accuracy of 61.11%. Consequently, Plaintiff had not demonstrated an ability to retain and apply material provided during his classroom training and had not demonstrated progress towards independent completion of work.

With regard to Plaintiff's conduct, the memorandum asserted that Plaintiff had shown an unsatisfactory attitude towards agency rules and regulations and had engaged in unacceptable conduct on the job. Specifically, on September 27, 2016, Plaintiff received an official reprimand for failure to follow a management directive regarding disposition of related cases on the same Social Security number. Additionally, despite repeated instruction and direction, Plaintiff refused to comply with the rebuttal process to challenge reviewed cases.

Plaintiff asserts that a SSA employee who is a white male, Kevin Frees ("Frees"), also had low productivity figures but was not terminated. In fact, five probationary employees in Plaintiff's training class were demonstrating low productivity numbers by November of 2016 – Plaintiff, Frees, David McCorn (an African-American male), Monte Owens (an African-American male), and Laura Newby (a White female). All five were informed that their production needed to increase significantly, they were all told so on the same day, and they were all given the same amount of time to improve their performance. David McCorn [an African-American male] and Frees brought their production up to 3.82 and 5.64 cases per day, respectively, and they were not terminated. Plaintiff, Owens, and Newby did not meet their respective production targets. Harris terminated Plaintiff and Newby, while Owens resigned before being issued a termination notice.

8

Case 4:20-cv-00036-DGK   Document 56   Filed 09/26/22   Page 8 of 17

**Plaintiff's 2018 application for a Debtor Contact Representative position**

In July and August of 2018, the SSA advertised a position for a Debtor Contact Representative. Plaintiff applied for the position and was determined to meet the minimum qualifications for it.

All applicants meeting the minimum qualifications were placed on a best qualified list. The list was comprised of sixty-nine candidates and included Plaintiff. The SSA undertook to interview all the applicants on the best qualified list. To do this, the SSA created five interview teams with three people on each team. Each team interviewed all candidates on the best qualified list and from there a score based on the interview was accessed and inputted into the spreadsheet.

A lead of one of the interview team was responsible for reaching out to assigned candidates to schedule interviews. If a candidate did not respond, the person was deemed as declining the interview for that position.

On August 7, 2018, the SSA sent an email to Plaintiff acknowledging his application, informing him that he was qualified for the position, and notifying him that he may "be contacted for an interview." Ten days later, on August 17, 2018, Faye Spikes, an Operations Supervisor, sent an email to Plaintiff that stated in part:

> You recently applied for the Contact Representative (Debtor Contact Representative) (SK 10265607TG) with the Social Security Administration in Kansas City. I attempted to call you and left a message. As stated in my message, I would like to schedule an interview and need for you to call me back as soon as possible.
>
> . . .
>
> Please be advised that the anticipated entrance on duty date is Sunday, September 30th (physically reporting on Monday, October 1st). If you are still interested in proceeding in the selection process

> please contact me at 816 936-3409 by Tuesday, August 21, 2018. If I
> do not hear from you by Tuesday, August 21, 2018, you may be
> removed from further consideration for the position.

On August 23, 2018, Spikes sent another email to Plaintiff that stated:

> Charles,
>
> Since I didn't hear from you by August 21th [sic], I am assuming you
> are not interested in interviewing for the position. If this is incorrect
> and you are interested in scheduling an interview, please let me know
> immediately.

Spikes received no response.

The names of individuals on the best qualified list (including Plaintiff), along with the interview scores, were forwarded to the selecting official for the SSA. The selecting official was Angel Garcia, Debt Management Section Chief, Kansas City, Mid-America Service Center. Garcia then ranked the candidates based on their interview scores and reached out to obtain job references for the candidates with the higher scores.

Garcia offered a position to all candidates who had an interview score of 20 or above, ultimately selecting nine individuals for the position (one offer was later rescinded following an unsuccessful background check). All candidates on the best qualified list were considered, but because he did not interview, Plaintiff was not a candidate with a higher score. Seventeen candidates either declined to be interviewed or were deemed to decline to be interviewed (including Plaintiff) and none of them were selected or the position. The nine candidates selected (Emma Perry, Marsha Wagner, Tammy Thomas, Amanda Pendleton, Janelle Gunnels, Avelina Carrillo, Stephen Toombs, Arejeanna Laury, and La-Keisha Jones) all interviewed for the position.

10

**Plaintiff's claims of discrimination and retaliation**

Plaintiff filed three administrative complaints of discrimination with the SSA. First, on November 28, 2016, Plaintiff filed an administrative complaint of discrimination alleging discrimination based on "Race/Sex (African Male)" for the letter of reprimand issued on September 27, 2016, as well as alleging harassment based on "Race/Sex (African Male)" between September 27 and November 14, 2016. Second, on December 27, 2016, Plaintiff filed a complaint alleging discrimination based on "Race/Sex (African Male)" for his termination on November 30, 2016, as well as alleging harassment based on "Race/Sex (African Male)" on November 30, 2016. Third, on September 7, 2018, Plaintiff filed a complaint of discrimination alleging discrimination based on "Race/Sex (African Male)" and retaliation for the failure of the SSA to hire him as a Debtor Contact Representative.

With regard to his claims of harassment in the first two administrative complaints of discrimination, Plaintiff identified the following incidents of alleged discrimination:

- On September 19, 2016, Harris stood one foot from Plaintiff's face.

- On September 27, 2016, Plaintiff was issued a letter of reprimand.

- On September 28, 2016, Hawkins assigned Sarah Ostmeyer the task of providing Plaintiff with the documentation relied on in issuing him the letter of reprimand.

- On September 29, 2016, Plaintiff went to Ostmeyer's desk and asked her to assist him with changing a beneficiary's home address, but Ostmeyer said she was "on lunch" and that she did not have time that day. However, about two hours later, Plaintiff observed a White male asking Ostmeyer a question and she smiled at him and answered his question.

- On October 14, 2016, Harris came into the classroom training and, although there was plenty of room by the printer at the back of the room, Harris stood directly behind Plaintiff's chair.

11

- On October 19, 2016, Hawkins reviewed Plaintiff's work and alleged that Plaintiff took the wrong action on a case.

- On November 3, 2016, Hawkins e-mailed Plaintiff regarding disagreements with errors that a Reviewer had given Plaintiff.

- On November 14, 2016, Harris threatened to terminate Plaintiff's employment if he did not see significant increase in production.

- On November 30, 2016, Plaintiff met with Harris in his office and Harris insisted on keeping the door open so that others could hear.

- On November 30, 2016, Harris used "menacing stares and a hostile tone while talking to [Plaintiff]."

- On November 30, 2016, Plaintiff asked Harris why he was hostile, and Harris replied, "That's your opinion" in an "arrogant tone."

- On November 30, 2016, after giving Plaintiff a termination letter, Harris told Plaintiff he had a box for him to put his things in and escorted Plaintiff down the hall to the classroom.

- On November 30, 2016, while Plaintiff was in the classroom gathering items, Harris "stood at the back of the classroom like a guard and as an intimidator with the box in his hand" and afterwards escorted Plaintiff from the building.

January 16, 2020, Plaintiff initiated this lawsuit.[3] On June 24, 2020, Plaintiff filed the six count Amended Complaint ("the Complaint"), ECF No. 10, which is the operative complaint.[4] The Complaint alleges the SSA discriminated against Plaintiff based on his race/gender (Count One), his

---

[3] On January 16, 2020, Plaintiff opened this lawsuit and filed a motion to proceed in forma pauperis which the Court denied without prejudice for failure to provide necessary information. ECF No. 1. On March 26, 2020, the Court approved a renewed motion to proceed in forma pauperis and ordered the Clerk's office to file the Complaint.

[4] On September 3, 2021, the Court granted Plaintiff leave to file a second amended complaint which added additional allegations but no additional claims, however the complaint was never filed. The fact that the proposed second amended complaint was never filed makes no difference to the outcome here since it adds no additional claims and Defendant would still be entitled to summary judgment.

race (Count Two), his gender (Count III), and in retaliation for engaging in EEO protected activity (Count Four). Counts Five and Six allege the SSA subjected him to a hostile work environment based on his race/gender.

## Discussion

### I. Defendant is entitled to summary judgment on Counts One through Four.

Plaintiff agrees with Defendant that this is a pretext case in which the Court should apply the three-step burden shifting analysis initially set forth in *McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973). Under this analysis, a plaintiff must first establish a prima facie case of gender or race discrimination. *Main v. Ozark Health, Inc.*, 959 F.3d 319, 324 (8th Cir. 2020). If the plaintiff can do so then, the analysis proceeds to step two. *Id*. Here, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. At step three the burden shifts back to the plaintiff to show that the employer's reason(s) were pretextual. *Id*.

The *prima facie* cases for race discrimination, gender discrimination, and retaliation are similar and well-settled. To initially shift the burden to the SSA, Plaintiff must establish the following:

> (1) he is a member of a protected group (*i.e.*, he is a minority, a male, a male minority, or has engaged in protected EEO activity),
>
> (2) he was meeting the legitimate expectations of his job duties (or, in the case of the rehiring decision, he was qualified for the position),
>
> (3) he suffered an adverse employment action or actions, and
>
> (4) a causal connection exists between his membership in the protected group(s) and the adverse action(s).

13

*Warmington v. Bd. of Reg. of Univ. of Minn.*, 998 F.3d 789, 797 (8th Cir. 2021) (gender discrimination); *Faulkner v. Douglas Cty. Neb.*, 906 F.3d 728, 732 (8th Cir. 2018) (race discrimination); *Du Bois v. Bd. of Reg. of Univ. of Minn.*, 987 F.3d 1199, 1203 (8th Cir. 2021) (retaliation).

Defendant argues Plaintiff cannot establish the second and fourth elements. The Court agrees. It is clear from the material undisputed facts that Plaintiff was not meeting the legitimate expectations of the Customer Service Representative position with respect to his performance and his conduct. Plaintiff's production level and job knowledge were sufficiently low that he was not going to be successful in the position. While the Court acknowledges that Plaintiff sincerely believes otherwise, the record here establishes that as a matter of law Plaintiff was not meeting the legitimate expectations of his job duties, and so summary judgment is appropriate. *See Shanklin v. Fitzgerald*, 397 F.3d 596, 602-03 (8th Cir. 2005) (holding that in light of the plaintiff's well-documented serious performance deficiencies, the plaintiff's questioning the reports was not enough to create a genuine issue of material fact sufficient to survive summary judgment). The record also shows that his conduct with respect to his supervisors was deficient in that he failed to follow his immediate supervisor's directions in processing a case, and that he was resistant to supervision generally.

Defendant also cannot show a causal connection exists between his race, sex, or prior protected activity and the adverse employment actions. The record establishes that the production expectations and rules requirements were applied equally to all members of Plaintiff's training class, including other African-American males. Nor is there evidence supporting a causal connection between Plaintiff's engaging in protected EEO activity and his being reprimanded, terminated, or not

hired for the Debtor Contact Representative position.

The two white male employees Plaintiff contends were similarly situated to him but who were not reprimanded or terminated were not, in fact, similarly situated. Neither had a similar history of misconduct that persisted after informal counseling and instruction from management. And no employee who failed to raise his or her production after being given a final warning was kept on. Hence, Plaintiff cannot meet his burden of showing that a similarly-situated person of a different race, sex, or who did not engage in protected activity, received more favorable treatment.

Accordingly, Defendant is granted summary judgment on Counts One through Four.

## II. Defendant is entitled to summary judgment on Counts Five and Six.

Counts Five and Six allege that Plaintiff was subjected to a hostile work environment based on his race/sex, race, and sex between September 29 and November 30, 2016. In order to establish an actionable claim of harassment to survive summary judgment, Plaintiff must establish that:

(1) he was a member of a protected class;

(2) he was subject to unwelcome harassment;

(3) the harassment resulted from his membership in the protected class;

(4) the harassment was severe enough to affect the terms, conditions, or privileges of his employment; and

(5) the SSA knew or should have known of the harassment and failed to take proper remedial action.

*Lopez v. Whirlpool Corp.*, 989 F.3d 656, 662 (8th Cir. 2021).

Defendant argues Plaintiff cannot satisfy the third or fourth elements, and the Court agrees. With respect to the third element, the Eighth Circuit has made clear that a plaintiff must present "competent evidence to link the complained of conduct to a [discriminatory] animus" and such

15

evidence requires "more than bare allegations that [a plaintiff was] harassed [his] because of [his] race [or gender or race-plus-gender]." *Palesch v. Missouri Comm. on Hum. Rights*, 233 F.3d 560, 566-67 (8th Cir. 2000). The record here establishes a workplace personality conflict between Plaintiff and his first-line supervisor (an African-American female) and his second-line supervisor (an African-American male). This is insufficient to establish an actionable hostile work environment. *See Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003) (finding no hostile work environment where competent evidence merely showed "that the harassment stemmed from inter-departmental politics and personality conflicts").

With respect to the fourth element, the Court notes the Eighth Circuit has instructed that "the claim-triggering conduct must be severe or pervasive enough to create an objectively hostile or abusive work environment." *Lopez*, 989 F.3d at 663. Whether an environment is hostile or abusive is determined by considering all the circumstances, including: the frequency of the conduct; its severity; whether it is physically threatening or humiliating, as opposed to a "mere offensive utterance;" and whether the conduct unreasonably interferes with an employee's work performance. *Id*. Appellate courts have cautioned that anti-discrimination statutes do not operate as "general civility codes," *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), and "[n]ot all unpleasant conduct creates a hostile work environment." *Williams v. Kansas City*, 223 F.3d 749, 753 (8th Cir. 2000). Eighth Circuit precedent "sets a high bar" for establishing conduct that is "sufficiently severe or pervasive." *Id*. "Hostile work environment harassment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 823 (8th Cir. 2017).

16

Plaintiff's allegations concerning the alleged harassment fall short of this demanding standard. As set out in his administrative complaints, Plaintiff alleges he was subjected to a hostile work environment based on scattered workplace events. Even assuming he could show these actions were undertaken by the SSA based on his race, gender, or race-plus-gender—which he has not—these limited and sporadic incidents do not, as a matter of law, create an objective hostile work environment. *See Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006) ("Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment."). The alleged harassment cannot be characterized as so severe or pervasive so as to have affected a term, condition, or privilege of his employment. Consequently, Defendant is entitled to summary judgment on Counts Five and Six.

**IT IS SO ORDERED.**

Date:   September 26, 2022              /s/ Greg Kays
                                        GREG KAYS, JUDGE
                                        UNITED STATES DISTRICT COURT